RICHARD S. ARNOLD, Circuit Judge.
At 10:00 p.m. on the evening of August 11, 1998, Kansas City police executed a warrant to search the home of David Do-ran for drugs and other contraband. Using a tactic called “dynamic entry,” the officers announced their presence and purpose but entered the house without knocking and affording its occupants time to answer the door. Officer Ty Grant, serving as “ram officer,” yelled “Police, search warrant,” simultaneously hitting the front door with his ram, breaking in on the third hit. Officer Mark Sumpter as “point man” was the first officer to enter the house. Sumpter moved quickly through the living room, reached the kitchen doorway, and saw Doran running toward him pointing a handgun. Sumpter testified that he yelled “Police, search warrant, get down,” and fired. Doran was shot twice, sustaining serious injuries.
Doran commenced this action under 42 U.S.C. § 1983, asserting Fourth Amendment damage claims against Officer Sump-ter for use of excessive force, Officer Grant for illegal entry, Sergeant Eric Greenwell for failure to supervise Grant, and the Board of Police Commissioners of Kansas City for failure to train its officers regarding Fourth Amendment restrictions on no-knock entries and for deliberate indifference to a custom and practice of no-knock entries. Doran testified that he had been asleep when he heard the ramming. Thinking it was a break-in or a fight on his front porch, he grabbed a pistol from under his pillow, ran from his bedroom into the kitchen, saw laser lights and realized it was the police, and bent to set his gun on the floor when he was shot. Doran denied hearing an officer yell, “Police, search warrant, get down,” before he was shot.
Officer Grant testified that Sergeant Greenwell had trained him always to ram the door at the same time as announcing a police presence. Officer Grant had never been trained to knock, nor witnessed another officer knock and announce, before ramming the door. Tr. 241-50.
After a four-day trial, the jury found in favor of Officer Sumpter on the excessive-force claim. It returned a verdict in excess of two million dollars for Doran on the illegal-entry claim against Officer Grant, the failure-to-train claim against Sergeant Greenwell, and the claims against the Board, finding that Doran’s injuries were the direct result of those Fourth Amendment violations. The District Court[1] held as a matter of law, before the case went to the jury, that the facts known to the police were not sufficient to support a reasonable belief that exigent circumstances justified the no-knock entry. Judgment was en *1050 tered on this verdict. The Board, Grant, and Greenwell appeal. We affirm.
I.
Kansas City narcotics detective Wesley Williamson obtained the warrant to search Doran’s home on August 6, 1998. Williamson did not participate in the execution of the search warrant and did not testify at trial. The warrant and warrant affidavit were not offered into evidence and are not part of the record on appeal. The parties agree that the warrant affidavit was based on an anonymous tip, and that the warrant did not authorize a no-knock entry. Except for running a test on trash found near the Doran home and doing a spot check of the residence, no other corroborating investigation was done.
The task of executing the warrant was assigned to the Police Department’s Street Narcotics Unit, a specialized unit whose primary function is to execute search warrants, usually on drug houses. Sergeant Greenwell was in charge of the Unit’s entry team. Before executing the warrant, Greenwell talked with the investigating officer and reviewed the warrant and warrant affidavit. He was told of an anonymous tipster’s accusations that methamphetamine was being manufactured at the Doran home; that the Dorans were selling crack cocaine and methamphetamine at the front door; that drugs were stored in dresser drawers throughout the house; that guns were kept in the bedroom; and that Doran’s 26-year-old son Joseph lived in the house and had recently been arrested for possessing a sawed-off shotgun. Sergeant Greenwell also did a drive-by to verify the location of the house and to “determine any tactical concerns,” but did no other corroborating investigation.
On the basis of this information, alleged by the informant but not well corroborated, and his experience with methamphetamine labs, Sergeant Greenwell concluded that this would be a high-risk entry and instructed his team to enter without knocking. On the evening of August 11, the entry team gathered at an assembly point a few blocks from the Doran home. Because of the hazards associated with methamphetamine labs, Greenwell arranged for a fire department pumper and an ambulance to wait at the assembly point, and members of the entry team other than Officer Grant wore respirators to reduce the risk from chemical fumes. After Sergeant Greenwell briefed the entry team, the team proceeded to Doran’s house and executed the warrant. Doran was shot soon after Officer Sumpter entered the house. The police completed the search after tending to Doran, finding one ounce of marijuana but neither a methamphetamine lab nor other illegal drugs. Do-ran had no prior criminal convictions and was not charged with an offense as a result of the search. This lawsuit followed.
II.
The defendants argue that because the jury found that Officer Sumpter’s use of force was reasonable, no proximate cause could exist against the other officers and the Board on the illegal-entry and failure-to-train claims. They argue that an act found reasonable by the jury starts anew the chain of causation. We disagree.
Both parties agree that a suit brought under 42 U.S.C. § 1983 sounds in tort. City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 709, 119 S.Ct. 1624,143 L.Ed.2d 882 (1999). Issues of causation in § 1983 suits are decided by looking to the common law. See e.g., Ricketts v. City of Columbia, 36 F.3d 775, 779 (8th Cir.1994). The issue presented by the defendants is not foreign to our jurisprudence. In Trudeau v. Wyrick, 713 F.2d 1360 (8th Cir.1983), a state prison warden was sued for violating an outside *1051 minister’s First Amendment rights. The minister, a gay man, had sent an inmate a response to a personal ad and a three-dollar check. Id. at 1362. The warden, thinking the inmate was attempting to exploit the minister, turned the letter over to the prison chaplain to “handle it.” Id. at 1363. The chaplain reported the incident to the monsignor who, upon discovering that the minister was gay, took an adverse employment action against him. Ibid. The minister then brought suit against the warden and won. On appeal, the warden claimed that the act taken by the prison chaplain broke the chain of causation, relieving him of any tort liability under § 1983. Id. at 1366. We did not accept the argument then, and we do not accept it now. Foreseeable intervening acts, be they lawful or unlawful, do not break the chain of causation.
“The question of proximate cause is ... normally one for the jury.” Ibid. The defendants had every opportunity to argue this issue in closing. The jury found a link between the defendants’ actions and Mr. Doran’s injury, and we see no reason to dispute that factual finding.
Further, we question the logic of the defendants’ argument. The jury was asked whether it was reasonable for Officer Sumpter, given the circumstances he faced once inside the home, to shoot Mr. Doran. Our review of the Board’s and the two officers’ conduct starts at a wholly different time. It begins with the custom of disregarding the knock-and-announce rule, and specifically the disregard of the rule in the search of the Doran home, and asks whether it was foreseeable that such disregard could result in injury to Mr. Doran. The reasonableness of Officer Sumpter’s actions does not control that question.
III.
Next, the defendants argue that the District Court erred when it ruled as a matter of law that no exigent circumstances existed. We disagree.
In Richards v. Wisconsin, 520 U.S. 385, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997), the Supreme Court held that “the police should be required to make [a showing of exigency] whenever the reasonableness of a no-knock entry is challenged.” Id. at 394-95, 117 S.Ct. 1416. The burden of proving exigency “is not high.” Id. at 394, 117 S.Ct. 1416. Even so, there is some flesh to the burden, and we do not think the police sufficiently demonstrated that exigent circumstances existed to justify their “dynamic entry” into the Doran home.[2]
The knock-and-announce rule posits that, unless countervailing law-enforcement interests are sufficient, officers executing a search warrant at a person’s home must knock and announce their presence before entering. See Wilson v. Ar *1052 kansas, 514 U.S. 927, 936, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995), and see also United States v. Mendoza, 281 F.3d 712, 717 (8th Cir.2002). The police can show a superseding interest by demonstrating a reasonable belief that the announcement would put them in danger, would be futile, or would inhibit effective investigation of the crime by allowing the destruction of evidence. Richards, 520 U.S. at 394, 117 S.Ct. 1416. We look to the particular facts known to officers on the scene and circumstances surrounding the entry in judging whether dispensing with the knock-and-announce rule was justified. See United States v. Cooper, 168 F.3d 336, 339 (8th Cir.1999). Thus, the burden is two-fold. The police must give a legitimate reason for doing away with the knock-and-announce rule, and there must be facts which make that concern reasonable. In the case at bar, both showings are weak.
We are not convinced that the police gave a legally sufficient reason for dispensing with the knock-and-announce rule. Officer Grant testified that exigent circumstances existed because (a) there was a “safety factor” involved in raiding drug houses, (b) there were violent, armed people in drug houses, and (c) he assumed the .existence of lethal fumes from the chemicals used to produce methamphetamine. Tr. 260-61. While not directly stated, the implication behind his testimony is that the police feared for their safety because the Doran house was presumed to be a methamphetamine lab. This reasoning, if allowed, would lead to a per se exception to the knock-and-announce rule for methamphetamine labs. The Supreme Court has warned against such a result. Richards, 520 U.S. at 394, 117 S.Ct. 1416 (“If a per se exception were allowed for each category of criminal investigation ... the knock-and-announce element of the Fourth Amendment’s reasonableness requirement would be meaningless.”). The Fourth Amendment preserves the right of privacy one has in one’s home. To overcome that privacy expectation, the police interest should be specific to the individual and the place, not generalized to a class of crime.
This is not to say that the class of offense should have no bearing on our exigency analysis. As the Supreme Court recently noted, “[pjolice seeking a stolen piano may be able to spend more time to make sure they really need the battering ram.” United States v. Banks, 540 U.S. -, -, 124 S.Ct. 521, 528, 157 L.Ed.2d 343 (2003). Thus, the type of crime should be considered in determining the existence of exigent circumstances, and undoubtedly methamphetamine-lab searches pose unique concerns of which we should be mindful. But in demonstrating a legitimate reason for disregarding the knock- and-announce rule, the police must provide an interest that is specific to the house they are searching, and the person who lives there — not rely on a per se presumption given the type of crime they are investigating.
Even had the police correctly framed their concern so as to state specific safety risks raised by the search of Mr. Doran’s home, we are not convinced that concern was reasonable. The exigency exception to the knock-and-announce rule was meant, in part, to lessen the risks law enforcement face in dangerous situations. See Wilson, 514 U.S. at 936, 115 S.Ct. 1914. It was not, however, meant to relieve officers of their obligations, in appropriate cases, to investigate before acting.[3]
*1053 Here, the police supported their safety-concern by pointing to the following evidence: an anonymous, uncorroborated tip that the Dorans were buying and making methamphetamine; the uncorroborated statement that the younger Mr. Doran had been arrested for illegal firearm possession; the uncorroborated statement that there were guns in the house; and drug residue in a trash bag found outside the home. Thus, there was almost no certainty to most of the information the police reportedly “knew.” Had the police done even some investigation or surveillance they would have had a better understanding of whether the Dorans posed a security risk justifying a no-knock entry. Instead, they relied on very sketchy information, a reliance we find unreasonable, and outweighed by the privacy interest the Fourth Amendment is meant to protect.
In reaching our conclusion, we are mindful of the terms of our test. We judge the reasonableness of an alleged exigency based on the “facts and circumstances known to the officers” at the time of the search. Cooper, 168 F.3d at 339. Here, the police knew very few facts, and the circumstances were that they had done very little corroborating investigation. Given their failure to corroborate the anonymous tip, we hold that they did not know enough to demonstrate exigency. It was their burden to demonstrate sufficient facts to support a finding of exigent circumstances, and they failed to do so. It was entirely appropriate for the District Court to infer that no efforts at corroboration were made. The government had the burden of proof, and surely it would have shown corroboration if there had been any.
IV.
The defendants also argue that the District Court improperly admitted the testimony of expert witness Gerald Gottlieb, as it was unreliable or untrustworthy. We are not persuaded.
Mr. Gottlieb, a certified public accountant, was retained by Mr. Doran to testify pn the amount of income Mr. Doran lost as a result of the shooting. To reach his conclusion, Mr. Gottlieb relied on Mr. Do-ran’s own estimation of his reduction in work capacity and the clients he lost. Mr. Gottlieb then took Mr. Doran’s preshoot-ing tax returns and client invoices to estimate the dollar amount of loss. At trial, Mr. Gottlieb described his education and his roughly thirty years’ experience as an accountant. He described what the plaintiffs requested him to do as “crunching numbers,” and he expressly stated on di *1054 rect examination that he had “no firsthand information as to what [Mr. Doran’s] capacity was.” Tr. 497, 501.
The defendants argue that because Mr. Gottlieb relied on Mr. Doran’s “best guess” as to Mr. Doran’s reduction in work capacity and not on a doctor’s analysis that his testimony did not cross the threshold of reliability necessary for an expert witness. Framed as it is, the appeal questions the admissibility of Mr. Gottlieb’s testimony and not his qualifications as an expert. This distinction is important. “Once the trial court has determined that a witness is competent to testify as an expert, challenges to the expert’s skill or knowledge go to the weight to be accorded to the expert testimony rather than to its admissibility.” Sylla-Sawdon v. Uniroyal Goodrich Tire Co., 47 F.3d 277, 283 (8th Cir.1995) (citations omitted). Put another way, “the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.” Loudermill v. Dow Chem. Co., 863 F.2d 566, 570 (8th Cir.1988). Thus, “[o]nly if an expert’s opinion is ‘so fundamentally unsupported that it can offer no assistance to the jury’ must such testimony be excluded.” Hose v. Chicago Northwestern Transp. Co., 70 F.3d 968, 974 (8th Cir.1995).
We do not think that Mr. Gottlieb’s testimony was unsupported. His mathematical calculations were derived using standard accounting procedures and based on Mr. Doran’s estimation (not just a “guess”). To the extent that the jury did not believe Mr. Doran’s estimation they could have reduced or eliminated their reliance on Mr. Gottlieb’s testimony. But to the extent that they believed Mr. Doran’s estimation, Mr. Gottlieb’s testimony was certainly helpful to the jury, and it was proper for the District Court to admit it.
V.
Finally, the defendants argue that the District Court abused its discretion in denying then* motion for a mistrial. Their argument on this point is two-fold. First, they argue that a mistrial should have been declared when Mr. Doran asked a witness whether he knew what “being sued in an official capacity” meant, and that his personal funds would not be used in paying any judgment rendered. The question, however, was never answered, as the defendants successfully objected. Second, the defendants argue that a mistrial should have been granted when the District Court denied their attempt to show that any verdict would be paid from taxpayer funds. We disagree.
We review a denial of a motion for mistrial for abuse of discretion. Sterkel v. Fruehauf Corp., 975 F.2d 528, 532 (8th Cir.1992). We rarely overturn a lower court’s ruling because the District Court “is in a far better position to measure the effect of an improper question on the jury than an appellate court which reviews only the cold record.” Williams v. Mensey, 785 F.2d 631, 637 (8th Cir.1986). We follow that maxim here, as we find the District Court’s ruling reasonable. Mr. Doran’s question was never answered, and any prejudicial effect caused by the mere question was cured by the Judge’s instruction to the jury that “[sjtatements, arguments, questions and comments by lawyers are not evidence.” Appellant’s App. at 57.
Affirmed.

. The Hon. Nanette Laughry, United States District Judge for the Western District of Missouri.

. The defendants alternatively argue that the District Court erred by not submitting factual questions to the jury before ruling on exigency. They cite Tamez v. City of San Marcos, 118 F.3d 1085, 1094 (5th Cir.1997), for support. We have found no case in our Circuit which adopts the Tamez test, and we do not choose to do so now, because even if we adopted Tamez, we would affirm the District Court’s ruling. The District Court held that there were no relevant factual matters in dispute, and the defendants did not request that special interrogatories be submitted to the jury. Further, on appeal, the defendants point to no specific fact that they allege was disputed. We agree with the District Court that there were no factual disputes for the jury to decide on the issue of exigent circumstances, and thus find the District Court’s decision to move on to the legal question proper. The issue is not whether the police believed the information in the anonymous tip. The issue is whether it was reasonable for them to believe the information in the anonymous tip.

. Although we have found no case directly dealing with the police obligation of investigation in exigency questions, precedent from an area of law with a similar burden of proof, Terry-stop disputes involving anonymous tips, strongly supports our position. For example, the Second Circuit has held that the informa *1053 tion needed to give rise to reasonable suspicion for the police to do a Terry seizure of luggage must meet a high standard of reliability. United States v. Walker, 7 F.3d 26, 29 (2d Cir.1993). In its words: "[rjeasonable suspicion is dependent upon both the content of information possessed and its degree of reliability.” Ibid. The Court reasoned that the disputed anonymous tip, standing alone, would generally not be reliable enough to justify a Teny stop because it lacked any indi-cia of reliability. Id. at 30. "However, because the police verified nearly every aspect of the tip, [the Court] conclude[d] that under the totality of the circumstances the police had reasonable suspicion....” Id. at 31. Similarly, the Supreme Court held in Alabama v. White, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), that "if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.” Id. at 330. In White the Court approved the disputed Terry stop because the police demonstrated significant corroboration of the anonymous tip. Id. at 331. In our case, the police did no corroborating investigation to show that the Dorans were either selling or making methamphetamine. While the defendants point to the trash test, such evidence, at best, points to use, and certainly does not demonstrate any of the potential concerns raised by an alleged meth lab, which might, if properly developed, justify disregarding the knock-and-announce rule.